Price, J.
After this case had been submitted and considered on the elaborate briefs of counsel of record, and a judgment rendered, it was allowed that other eminent counsel, not connected with such briefs for the plaintiff in error, might be heard orally and by brief in furtherance of his claims in this proceeding. These additional arguments have been made, and we now briefly state *162 our views of the long-continued but still important controversy.
The plaintiff in error prevailed in the lower court, in a large measure, and the defendants have filed a cross-petition in error, asking a reversal of so much of the decree of the circuit court as exempts from taxation certain pieces of property therein pointed out. As a result of the findings and decree of the lower court, so largely in favor of .the- plaintiff in error, his present complaint- is narrowed to the question of taxing what are denominated “priests' houses,'' or commonly known as residences of the priests. All the oral argument centered upon this question, and its decision is controlled by the facts as found by the circuit court; for we are not required to wade through the great mass of testimony in order to arrive at a conclusion on its weight, where conflict exists.
It is not out of place here to say in advance that we do not regard the claim of plaintiff in error as either technical or frivolous, for the cause he represents has substantial character and legal merit worthy of the careful consideration we havé given it. Nor is the idea entertained by this court that the great Catholic Church here represented, and which is always loyally submissive to the lawful authority of the state and nation, is now seeking to evade the discharge of a legal obligation, if that obligation is made to appear. The earnestness of its appeal refutes such a view of the case.
The Diocese of Columbus, like the others, is a jurisdictional division of the Roman Catholic Church, and is presided over by the Bishop. By *163 virtue of his appointment as such Bishop, and under the laws governing such church in the State of Ohio, all the property mentioned in the petition and cross-petition is held by the plaintiff (the Bishop) in his own. name, in trust for the sole uses and purposes of said Roman Catholic Church, such as its places of public religious worship, its public parochial schools, academies; its congregations in the respective parishes, and its institutions of purely public charity, and its public institutions of learning. The diocese is divided into parishes, which are presided over by a pastor appointed by the Bishop, and the church edifice, schools, priests’ houses and other buildings upon the church property, within the respective parishes, belong in equity to the respective parishes. (See second finding of fact.)
It has also been found, in general, that the Roman Catholic Church is an institution which has for its chief and primary object and purpose the teaching and extending of its recognized forms of religious belief and worship into all parts of the world, and that it was founded to continue the work of Christ on earth, and “to teach, govern, sanctify and save all men.” (Third finding of fact.)
Also, that charity is included in all its teachings, purposes and practices, as subordinate to its spiritual teachings and purposes, but as an essential part of its general scheme of church work. (Fourth finding of fact.)
Also, that the public, without distinction or discrimination as to race, condition, creed, or otherwise, are fully admitted to all the churches and *164 religious services, to the public parochial schools, academies, asylums, and to all its other charitable institutions, and all its churches, schools, academies, educational institutions, asylums, hospitals and other purely public charitable institutions and societies, and the benefits derived therefrom are open and free, and available to all persons upon the same conditions, irrespective of creed, race, condition, or otherwise. (Fifth finding.)
Also, it has been found by the lower court that, the members of the church support and maintain it and its schools and benevolent, educational and charitable institutions by their voluntary contributions, and all the real estate in controversy was donated and purchased and paid for, in so far as the purchase price has been paid, by the voluntary contributions and offerings of the members of said church, and its congregations, and by others interested in the religious, educational and charitable purposes of said church. (Sixth finding.)
The only purpose of acquiring and holding the real estate in controversy was to subserve the religious, educational and charitable purposes of the said church, and the respective congregations and charitable institutions, and the buildings thereon, are permanent, and intended to and do subserve the same purpose; and no part of said real estate or buildings has ever been leased or- otherwise used with a view to profit, and no income, rent or profits whatever is or has ever been derived from either said real estate or the buildings thereon. ( Seventh finding.)
The Bishop and priests are celibates, and, under the vows of their ordination, their entire lives are *165 devoted to teaching and preaching the gospel, administering the sacraments; to works of purely public charity; to organizing religious congregations and benevolent, charitable and temperance societies; to building churches, public parochial schools, asylums, hospitals, and other institutions of purely public charity, and sustaining them. (Eighth finding.)
The duties of the priest are multifarious. He administers all the affairs of the church, both spiritual and temporal, and has charge of the public parochial schools, societies, hospitals and charita-' ble institutions within the parish; is principal of the parochial schools, attends them daily, and sometimes teaches in them. He must go to the church edifice every morning to celebrate mass, and there administer the sacraments every day, and sometimes more frequently. He must conduct services in the church every Sunday and on holjdays. He must, and does, respond at all hours of the day and night to calls from sick persons, irrespective of creed, and those in distress, or desiring to make confessions, the latter being required to be heard in the church, except occasionally confessions of men. He solemnizes the marriage rite, and conducts religious exercises at baptism and burials. (Ninth finding.)
The priest performs many. of his duties at his place of residence, known as the priests’ houses. He there keeps the books of account of the financial transactions of his parish, and also a- record of the marriages, baptisms, interments and confirmations. The priest’s house is used as a place of instruction for converts and for children pre *166 paring for the first communion. Sometimes classes of school children are taught there. The confessions of men are occasionally heard there. The total abstinence pledge is administered and the marriage ceremony occasionally performed there. It is the duty of the priest to keep a light perpetually burning in the church edifice, in front of the Blessed Sacrament. (Tenth finding.)
The priests’ houses are also used as places for the distribution of gifts to the worthy pot>r, regardless of their religious belief, their race, and without discrimination. Contributions are there received and dispensed. The priest is in charge of the houses and dispenses these charities. Temperance, benevolent and other charitable societies and institutions are there formed and • fostered. ' The committees of the church and school, as well as the church choir, sometimes meet there. Family and neighborhood disputes are there settled, and the priest is the arbitrator to settle such disputes. The religious, charitable, educational and benevolent work of the congregations is directed and carried on from the priests’ houses. The parents of the school children, teachers and scholars, and others interested in the work of the congregation and its societies, there consult the priest about the schools and the work of the congregation. (Eleventh finding.)
All of the priests’ houses are in constant and hourly use for said purposes, and these facts, together with the frequency of the demands for the priest’s presence at the church, render his residence in the immediate vicinity thereto a great convenience, if not a necessity; and all are free of *167 charge, and no profit is derived therefrom. (Twelfth finding.)
The priests lodge and board in the priests’ houses, which, with respect to all the property in controversy, are built on the grounds attached to the respective churches and schools, except in the second parcel, where the priest’s house is separated from the combined church and school by a twenty-foot alley, and all were built and paid for and furnished by the voluntary contributions of the respective congregations'; and the grounds thus occupied are not more expensive than they might be, and be reasonably appropriate and necessary for their proper occupancy, use and enjoyment of the schools and churches, if used for no other purpose than as connected therewith. These houses are sometimes separated from the church and school, and in others are directly connected with them.
The priests and Bishop and their assistant priests, and the domestics, are the only persons that lodge in said houses. (Thirteenth finding.)
On the facts thus stated, the circuit court held that the houses of the Bishop and priests are not exempt from taxation. Has the law been properly applied to the facts ?
Our constitutional provision with reference to taxation, as it stood before the late amendment exempting certain classes of bonds, and so far as pertinent here, reads: “Laws shall be passed, taxing by a uniform rule all moneys, credits, etc., etc.; * * * also all real and personal property, according to its true value in money; * * * but burying grounds, public school houses, houses *168 used exclusively for public worship, institutions of purely public charity, public property used exclusively for any purpose, and personal property, to an amount not exceeding in' value two hundred dollars for each individual, may by general laws be exempted from taxation” * * * (see Section 2 of Article XII).
This section furnishes the governing principle for all laws levying all taxes for general revenue, and as to the class of property now in controversy, the legislature has provided Section 2732, Revised Statutes, in part as follows: “The following property shall be exempt from taxation: First. All public school houses, and houses used exclusively for public worship, the books and furniture therein, and the grounds attached to such buildings necessary for the proper occupancy, use and enjoyment of the same, and not leased or otherwise used with a view to profit; all public colleges, public academies, all buildings connected with the same, and all lands connected with public institutions of learning not used with the view to profit. * * *
“Second. All lands used exclusively as graveyards, or grounds for burying the dead, except, etc. * * *
“Third. All property, whether real or personal, belonging exclusively to the state or United States.
“Fourth. County buildings (describing them).
“Fifth. All lands, houses and other buildings belonging to any county,, township or town, used exclusively for the accommodation or support of the poor.
“Sixth. All buildings belonging to institutions *169 of purely public charity, together with the land actually occupied by such institutions, not leased or otherwise used with a view to profit, and all moneys and credits appropriated solely to sustaining, and belonging exclusively to, such institutions.”
By later legislation, armories of lawfully organized military organizations were added to the exemption under this clause.
By the terms of the above provision of the constitution and the sixth clause of Section 2732, Revised Statutes, both already quoted, it is urged that the residences of the Bishop and priests are exempt, and therefore we are required to consider, if not construe, these provisions in the light reflected by the facts of the case. As to exemptions claimed by individuals and corporations for profit, the rule seems to be, that the .right to exemption under the law should be reasonably clear, the presumption being that all property is subject to taxation by a uniform rule, to the end that all property bear its due share of the burdens of government. And while we do not apply strict rules of construction in cases where religious, charitable and educational institutions seek exemptions, we think such right to exemption should appear in the language of the constitution or statute, with reasonable certainty, and not depend on their doubtful construction. A much more stringent rule is laid down in Lee, Treasurer, v. Sturges, 46 Ohio St., 153. In that case the question was the liability to taxation of certain stock in a corporation, which the owner claimed to be exempt under the statute. Spear, J., in the opinion, on *170 page 159, uses this language: “And further, that when an exception or exemption is claimed, the intention of the general assembly to except must be expressed in clear and unambiguous terms.” * * * But we are not disposed to use that rule in this case, believing that' the rule, as we now have stated it, is as liberal as plaintiff in error can ask, viz.: that the right to exemption should appear in the language of the constitution or statute with reasonable certainty, and not depend on their doubtful construction. There is no presumption of exemption from taxation because the institution claiming it is of a religious or charitable nature, for it is perfectly competent for such institutions to own property clearly subject to taxation.
Looking again to the constitutional provision under consideration, we see that burying grounds, public school houses, houses used exclusively for public worship, institutions of purely public charity, * * * may, by general laws, be exempted from taxation. The burying grounds or cemeteries mentioned in the pleadings and findings, were declared exempt by the lower court; also the churches and cathedral, as places used exclusively for public worship; also the public parochial schools, and the church's institutions of purely public charity. Other “public school houses,” and “public property used exclusively for any public .purposes,” are not involved, for the Catholic Church is not claiming to own such “public school houses” and such “public property.” And when the general assembly acted under this constitutional authority, it said, in Section 2732, Revised Statutes, that “public school houses, *171 and houses used exclusively for public worship, * * * and the grounds attached to such buildings necessary for the proper occupancy, use and enjoyment of the same, and not leased or otherwise used with view to profit,” are exempt. And by the sixth clause, “all buildings belonging to institutions of purely public charity, together with the land actually occupied by such institutions,' not leased or otherwise used with a view to profit,” * * * are exempt'.
It is manifest, from the carefully worded language of these provisions, that the legislature intended to place strict limitations upon exemptions, and great caution has been exercised in the terms expressed, so that the right of exemption conferred would not be abused or unduly enlarged, and such restrictions are essential to a fair and equitable sharing in the burdens of taxation.
In the case at bar, we find that the Catholic Church erected its places of public worship, and they are houses used exclusively for that purpose, and the different parishes provided places of residence for their priests, and whether denominated parish houses, or houses for the priests, they were erected and are being used by the priests and their assistants as places of residence. While they are celibates, and not the heads of families, as is common in Protestant denominations, they necessarily have household help and domestic service in order that these houses be what they should be— places of residence. While the priests devote themselves wholly to the service of God and to works of religion and charity, although universal in character, they, like other men, have the phys *172 ical and temporal wants for which provisions must be and are made. Besides the religious and charitable duties performed, and the dispensing of charities in these houses, they are places open to social calls and the extension of the proper and pleasant amenities of life.
The religious rites and ordinances of the church organization are celebrated or observed in the places of public worship, although occasionally the confessions of men are heard and the marriage ceremony is performed in the house of the priest. There, too, the financial accounts of the parish are kept, records of marriages, baptisms, interments and confirmations. The house is used as a place of instruction for converts, and for children preparing for their first communion, and sometimes school children are taught there. To these houses committees of the church and schools may resort, and they are used as places for the distribution of gifts to worthy poor, regardless of religious belief, their race, and without discrimination. From them the religious, charitable and educational work of the congregation is directed. Many other services for the church are there rendered, which are enumerated in the above findings. It is not found as a fact that all such services are necessarily rendered at these parish or priests’ houses; but no doubt some of them are of that character. But it is clear that such houses are primarily places of residence, as the church building is primarily a place of public worship; and it does not alter the law, as we think, that the increasing demands upon the time and devotion of the priest make it necessary or convenient to *173 perform many of his duties at his place of residence. We have no doubt that the parsonage of the Protestant pastor is used for many services similar in character and purpose.
The exemption is not of such houses as may be used for the support of public worship; but of houses used exclusively as places of public worship.
In Gerke, Treas., et al. v. Purcell, 25 Ohio St., 229, this rule is expressed in the tenth paragraph of the syllabus, as follows: “A parsonage, although built on ground which might otherwise be exempt as attached to the church edifice, does not come within the exemption. The ground in such case is appropriated to a new and different use. Instead of being used exclusively for public worship, it becomes a place of private residence. The exemption is not of such houses as may be used for the support of public worship, but of houses used exclusively as places of public worship.”
And in this connection it is well to note the frequency of the use of the word exclusively in the several clauses of Section 2732, supra. It was evidently intended that such word should be given special consideration when the right to exemption of property is presented for decision, and its frequent use by the legislature, we think, is significant.
But we are told that we should not now be influenced by the above case, “because a careful examination of that case will show that the court did not consider or pass upon any question presented in this brief; that the parsonages were not considered in any other aspect than as 'houses *174 used exclusively for public worship/ and not as buildings belonging to institutions of purely public charity; that the record in that case did not show the auxiliary or incidental character of the residential features, but, on the contrary, characterized such features as the only use of the priests' houses,” etc. This leads us to examine more minutely what was involved and decided in the case referred to; and we find in the statement of the cáse that Purcell, as Archbishop of the Roman Catholic Church for the Diocese of Cincinnati, filed a petition in the superior court to enjoin the collection of taxes on various pieces of real property which he claimed were exempt from taxation. As to part of the property, a perpetual injunction was granted; and as to the remainder, the petition was dismissed. Gerke, treasurer, prosecuted error on two grounds: (1) That the court erred in enjoining the collection of the taxes .levied on the parochial school houses and playgrounds connected therewith; (2) In enjoining the taxes levied on the property used as parsonages. The statement continues as to the parsonages, and says: “They are usually, though not invariably, built on the ground attached to the church edifice, and the grounds are not more extended than they might be, and be exempt from taxation, if used for no other purpose than as connected with the church edifice as a place of worship. These are sometimes separated from the church edifice, and in others directly connected with it. They are the residences of the priests, for which they pay no rent, and from which source the church de *175 rives no profit, otherwise than saving' the expense of providing such residences elsewhere.”
From this statement it is seen that Gerke was insisting on taxing both the parochial schools and playgrounds and the parsonages, and his counsel, in their brief, asserted, in substance, that “in no légal sense are the schools of the Roman Catholic Church public and within the exemptions of the act, nor are they free. Revenue is derived from them, and whether the amount is sufficient to maintain them is immaterial.” Again, they say: “The Catholic schools of the defendant in error are purely private and sectarian.” * * * Again: “It is clear that the schools of the defendant in error do not fall within the class referred to in these enactments, or within any class of schools legislated for by any act of the Ohio legislature.” The brief, as found in the report of the cáse, does not discuss the taxation of parsonages. When we look to the brief of the eminent counsel for Purcell, we see that they state the issue as follows: “There are four classes of property the taxation of which is in dispute in this case: (1) The Roman Catholic parochial school houses; (2) The playgrounds connected therewith; (3) Two vacant lots used in connection with the church edifices; (4) Priests’ dwellings.” Again, in speaking of the exemption of the playgrounds, they say:- “It is just as true that the dwellings of the clergy are necessary to the proper occupancy, use and enjoyment of the churches and schools of the Roman Catholics.” Then counsel proceeded in the latter part of their brief, as reported, to discuss the meaning of “public schools,” *176 as mentioned in the exempting statute, as compared with the use of the words, “institutions of purely public charity.”
White, J.,
on page 244 of the opinion, in speaking of the schools as institutions -of purely public charity, says: “As to the first of these questions, it seems to us the charity is to be regarded as purely public. For the purpose of determining the public nature of the charity, it is not material through what particular forms the charity may be administered. If it is established and maintained for the use and benefit of the public, and so conducted that the public can make it available, this is all that is required. But is it competent for the legislature to treat the buildings and lands connected therewith, used for carrying on the schools, as institutions, or as property belonging to institutions? The term ‘institution’ is sometimes used as descriptive of the establishment or place where the business or operations of a society or organization is carried on; at other times it is used to designate the organized body. It is used in both senses in the third section of the tax law brought under consideration in this case. It is used in the former sense in the first clause of the section, where it is disclosed that ‘all lands connected with public institutions of learning, not used with a view to profit, shall be exempt.’ In the sixth clause of the section it is used in the latter sense, and the property referred to is described as belonging to the institutions named.”
And on page 245, in speaking of colleges and other high institutions of learning not founded by the state, it is said: “All of,these institutions *177 stand, as respects their claim to exemption from taxation under the constitution, on the ground of their being institutions of purely public charity.” * * * After all the careful discrimination in the use of the statutory words touching “houses used exclusively for public worship,” and “institutions of a purely public charity,” we can not agree with counsel that the court and counsel in that case overlooked the relation which the priests’ houses or parsonages sustained to institutions of “purely public charity.” On the other hand, we think all clauses of the exempting statute must have been held up to view and most carefully scrutinized. The scope of argument and decision satisfactorily indicate this. No doubt the heat of the controversy was over the parochial schools and playgrounds; but the construction of statutes to save them from taxation reflected as well on the claim as to the parsonages. We can not believe that the eminent counsel and the learned court overlooked or lost sight of one of the most prominent clauses of the section. And what conclusion did the court reach as to them? On page 248 it is said: “But a parsonage, although built on ground which might otherwise be exempt, as attached to the church edifice, does not come within the exemption. The ground in such case is appropriated to a new and different use. Instead of of its being used exclusively for public worship, it becomes a place of private residence. Nor does it make any difference that, by the usages of the church, the presence of a priest or pastor is essential to conduct the services of public worship. Other persons are necessary to carry on public *178 worship as well as a minister to conduct the services. There must be a laity or congregation as well as a minister or preacher, and it is equally necessary that they should have places of abode; yet it would not be claimed that, their residences should be exempt.” * * *
Because the court did not speak of such parsonages as buildings not belonging to “institutions of purely public charity,” we must not infer that they were not weighed by that test of the statute.
But if the question is not foreclosed by Gerke v. Purcell, supra, are priests’ houses “buildings belonging to institutions of purely public charity” within the meaning of clause six of Section 2732? We think not.
This section classifies property for the purposes of exemption, as plainly appears in a reading of it. First come all public school houses and houses used exclusively for public worship, etc.; second, cemeteries; third, state and federal property, etc.; fourth, county buildings; fifth, poor houses, etc.; sixth, all “buildings belonging to institutions of purely public charity,” etc. It is evident that the parsonage is not itself an “institution” of such character, for at least one reason, that the parsonage has a mixed use, as we have observed, and would not be a building used for purposes of purely public charity. Then to what “institution” does the parsonage belong? While the legal title is in the Bishop in trust, as is true of all church property, the real ownership is in the parish where it is located; in other words, in the Catholic Church, either locally or generally. Is the Catholic Church, locally or generally, an “institution *179 of purely public charity”? Like the word “exclusively,” as used in preceding clauses of said Section 2732, the word purely expresses a kindred limitation, or rather exclusion, in that it means free from mixture or combination, and, as applied in the present connection, the charity must be unalloyed with other purposes and objects. But the Catholic Church, to which the parsonages or priests’ houses belong, is not an institution of purely public charity. It teaches and practices charity; but that is not its whole mission in the world. Its character is defined by the third and fourth findings made by the circuit court. There it is said: “The Roman Catholic Church is an institution which has for its chief and primary object and purpose the teaching and extending of its recognized form of religious belief and worship into all parts of the world, and was founded to continue the work of Christ on earth, and to teach, govern, sanctify and_ save all men.
“Charity is included in its teachings, purposes and practices, as subordinate to its spiritual teaching and purpose, but is an essential part of its general scheme of church work.” * * *
So it seems that, instead of the church to which the residence of the priest belongs being an “'institution of purely public charity,” it is a religious institution primarily, and its charity is subordinate to its spiritual teachings, and consequently the exemption claimed is not authorized by the sixth clause of the section. In the first clause, school houses and churches are not dealt with as “institutions of purely public charity,” but as what the clause asserts them to be, “public school houses, *180 and houses used exclusively for public worship,” etc.; and we think it is not permissible, when the exemption fails under the first clause, to abandon the religious character of the church edifice and organization and their relation to each other, and save the parsonage as a building belonging- to an “institution of purely public charity.” The use to which the property is devoted determines its right to exemption, under any clause of the section.
Again, it is said of the case of Gerke v. Purcell, supra: “The record in that case did not show the auxiliary or incidental character of the residential features, but on the contrary characterized such features as the only use of the priests’ houses.” True it is that the record of that case as reported does not develop fully the various religious and charitable services rendered at the parsonage by the priest, as is done in the case at bar. But his duties, we venture to assume, are common to the priesthood of both Cincinnati and Columbus, but they may vary in number and degree. In both jurisdictions, the priests are celibates, without families, of course, and are boarded and lodged in the parsonage, where ordinary domestic’s services are required. And the calls of charity and other duties to be answered at and from the parsonage, we presume, are common to both cities, if not universal in that church. Therefore, we are not able to perceive a line of distinction between the two which shakes our confidence in the judgment in Gerke v. Purcell, supra.
Our views as to the exemption statute are not in conflict with the holdings in Humphries, Audi *181 tor, et al. v. The Little Sisters of the Poor, 29 Ohio St., 201. Indeed, we think our consideration of the terms, “buildings belonging to institutions of purely public character,” is fully authorized by the doctrine of that case. Nor is the case of Little, Treas., v. The U. P. Theological Seminary, 72 Ohio St., 417, an obstacle in our pathway when its foundation principle is once discovered and understood.
The case of Davis, Auditor, v. The Cincinnati Camp Meeting Assn., 57 Ohio St., 257, is also relied on to support the contention of plaintiff in error. The facts of that case as reported by the court are somewhat extended, while the opinion of the court is brief, as is usual in a per curiam. We think that the court in that case traveled toward the extreme of liberal statutory construction, and we can not apply its logic to the facts of the case in hand.
As to the cross-petition in error, we need only say that we have not been convinced that error was committed by the circuit court on any of the grounds assigned therein. We are unanimous in adhering to our former judgment.

Former judgment adhered to.

Shauck, C. J., Crew, Summers, Spear and Davis, JJ., concur.